Filed 3/6/24  Marriage of Braunstein CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

<table>
<tr><td>In re Marriage of MELISSA and EVAN BRAUNSTEIN.<br><br>MELISSA BRAUNSTEIN,<br><br>    Respondent,<br><br>      v.<br><br>EVAN BRAUNSTEIN,<br><br>    Appellant.</td><td>G061854<br><br>(Super. Ct. No. 09D003078)<br><br>O P I N I O N</td></tr>
</table>

Appeal from postjudgment orders of the Superior Court of Orange County, Sandy N. Leal and Yolanda V. Torres, Judges.  Affirmed as modified.

Merritt L. McKeon for Appellant.

No appearance for Respondent.

Evan Braunstein (Father) and Melissa Brandes (formerly Braunstein) (Mother) are the parents of a child who is now 16 years old (minor). When their marital dissolution was finalized, the parties agreed Mother would have primary physical custody of the minor. In 2020, Mother asked the trial court to change the custody order to allow the minor to move to Florida with her. Father opposed the request.

After an evidentiary hearing, the trial court granted Mother's move-away request. Six months later, Father filed a request to reconsider the order. The court denied that request without a further evidentiary hearing. Father appeals from the initial order granting Mother's move-away request and the later order denying his request for reconsideration. Finding no error, we affirm both orders.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### THE PARTIES ENTER A STIPULATED JUDGMENT IN THEIR DISSOLUTION PROCEEDINGS, WHICH INCLUDES A CUSTODY ORDER

Mother and Father married in November 2007 and separated in November 2008. A stipulated judgment of dissolution was entered in April 2013, when the minor was five and one-half years old. Mother and Father agreed to joint legal custody, with Mother having primary physical custody and Father being granted visitation periods. The stipulated judgment included a finding for purposes of child support that Mother had a timeshare of 85 percent and Father had a timeshare of 15 percent.

### II.

### MOTHER REQUESTS MODIFICATION OF THE CUSTODY ORDER BASED ON HER MOVE TO FLORIDA

In November 2020, when the minor was 12 years old, Mother filed a request for order (RFO) to move with the minor to Florida. Mother explained in the RFO she needed to relocate to Florida due to a job change necessitated by the economic downturn caused by the COVID-19 pandemic. She later withdrew the RFO from the court's calendar but refiled it on December 7, 2020.

2

Father filed an ex parte RFO on December 22, 2020, requesting the minor not move to Florida pending a hearing. The trial court restrained the move and ordered "the minor shall not be relocated out of state pending hearing." On February 3, 2021, the court ordered a partial child custody investigation (CCI) be conducted to determine whether the move-away would be in the minor's best interests. Mother moved to Florida while the CCI was pending, and the minor remained with Father and Father's parents in Orange County.

The CCI report was filed by Family Court Services on May 25, 2021. It recommended the minor stay in California with Father. The CCI report found the minor was mature and intelligent, wanted to stay with Father, with whom he had a close bond, and wanted to stay in South Orange County because his lifelong friends were there.

### III.
### AFTER AN EVIDENTIARY HEARING, THE TRIAL COURT GRANTS MOTHER PHYSICAL CUSTODY OF THE MINOR AND APPROVES THE MOVE TO FLORIDA

An evidentiary hearing began before Judge Leal in June 2021 and concluded in January 2022 (Evidentiary Hearing).[1] During the course of the Evidentiary Hearing, counsel was appointed for the minor (minor's counsel). Minor's counsel conveyed to the court the minor's desire to remain in California and to spend school vacations with Mother in Florida. Minor's counsel also advised the court he supported the minor's preference and explained the reasons he did so.

At the end of the hearing, the trial court announced its findings and orders on the record from the bench. As pertinent here, the court made the following findings:

– Mother was the primary caregiver and the minor resided primarily with Mother.

---

[1] By the time the Evidentiary Hearing concluded, the minor had turned 14 years old.

3

- In a move-away case, the court must consider the child's interest in stability and continuity of custody, the distance of the move, the child's age, the child's relationship with both parents, the relationship between the parents, including their ability to communicate and cooperate, the parents' willingness to put the interests of the child ahead of their own interests, the reasons for the proposed move, the extent to which the parents currently share custody, and, where appropriate, the child's preference. The court addressed and made findings on each factor.

- The court questioned the minor's maturity and the truthfulness of some of his statements, as reflected in the CCI report, concluding the minor attempted to both minimize problems with Father and minimize the quality of his relationship with Mother in order to achieve the custody result he desired.

- Father was not co-parenting in the minor's best interests; Mother was.

- Mother's move to Florida was necessitated by economics and was not an attempt to alienate Father from the minor.

- Father's testimony about his custody and visitation was inconsistent and not credible.

- The court granted Mother's request to move to Florida and have custody of the minor, but ordered the move not take place until after the end of the current school year; the minor would spend vacations with Father.

The trial court denied Father's request for attorney fees despite Mother's considerably greater income because Father's testimony regarding his income, available funds, and needs was neither credible nor consistent. The court entered a minute order on January 18, 2022, that contained the court's orders and directed counsel to prepare a statement of decision (January 18 Minute Order). The court's signed statement of decision issued May 18, 2022 (May 18 Statement of Decision).

4

Later, in connection with Father's request for reconsideration of the move-away order (discussed below), Father's counsel complained the trial court had not issued formal findings and order after hearing following the Evidentiary Hearing and the January 18 Minute Order. In response, the court entered formal findings and order after hearing on September 15, 2022 (September 15 Formal Findings). The September 15 Formal Findings are substantively identical to the court's May 18 Statement of Decision.

IV.

MOTHER AND FATHER FILE RFOS REGARDING THE MINOR'S MOVE TO FLORIDA; THE TRIAL COURT DECIDES THE RFOS WITHOUT ANOTHER EVIDENTIARY HEARING

Mother filed an RFO on July 6, 2022, for a temporary emergency order to enforce the January 18 Minute Order and the May 18 Statement of Decision (Mother's July 6 RFO). The matter was assigned to Judge Torres. The trial court granted the temporary emergency order, set a hearing, and made the following ex parte emergency orders: (1) Mother shall have primary physical custody of the minor; (2) Father shall immediately facilitate the minor's custody exchange; (3) the minor shall reside primarily with Mother and attend high school in Florida; (4) Father shall not take any steps to enroll the minor in school in California; and (5) both parties shall encourage the minor to comply with the court's orders.

Father filed an RFO for a temporary emergency order on July 18, 2022, requesting reappointment of minor's counsel, a new CCI, and a new custody order (Father's July 18 RFO). Father submitted a declaration stating the minor was refusing to move to Florida and asked the trial court to change the existing custody order (set forth in the January 18 Minute Order) to allow the minor to remain in California and attend high school in Orange County. The court denied Father's July 18 RFO pending hearing.

The trial court conducted a hearing on Mother's July 6 RFO and Father's July 18 RFO on August 9, 2022, and issued a minute order addressing both that same day (August 9 Minute Order). The court found there was no change in circumstances, the

5

January 18 Minute Order entered after the Evidentiary Hearing should stand, and the minor must move to Florida with Mother. The court found Father's July 18 RFO did not make a prima facie showing and dismissed it without an evidentiary hearing. On September 14, 2022, the court filed a statement of decision regarding the dismissal of Father's July 18 RFO.

## V.

### FATHER FILES A NOTICE OF APPEAL

On September 26, 2022, Father filed a notice of appeal of both the September 15 Formal Findings (related to the Evidentiary Hearing and the original move-away order in the January 18 Minute Order) and the August 9 Minute Order that denied Father's July 18 RFO.

## DISCUSSION

### I.

### STANDARD OF REVIEW

"The standard of appellate review of custody and visitation orders is the deferential abuse of discretion test. [Citation.] The precise measure is whether the trial court could have reasonably concluded that the order in question advanced the 'best interest' of the child. [The reviewing court is] required to uphold the ruling if it is correct on any basis, regardless of whether such basis was actually invoked." (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 (*Burgess*).)

### II.

### THE TRIAL COURT APPLIED THE CORRECT DE NOVO STANDARD AND MADE NECESSARY FINDINGS REGARDING MODIFICATION OF THE CUSTODY ORDER UNDER *BURGESS*

"[W]hen parents *share* joint physical custody of the minor children under an existing order and in fact, and one parent seeks to relocate with the minor children . . . the custody order 'may be modified or terminated upon the petition of one or both parents or on the court's own motion if it is shown that the best interest of the child

requires modification or termination of the order.' [Citation.] The trial court must determine de novo what arrangement for primary custody is in the best interest of the minor children." (*Burgess, supra*, 13 Cal.4th at p. 40, fn. 12.)

"[I]n a move-away case where there is genuine joint physical custody . . . it is unavoidable that the existing custody arrangement will be disrupted. One parent or the other must be given primary physical custody. Accordingly, a 'de novo' determination— in effect, a 'reexamination' of the basic custody arrangement—makes sense." (*In re Marriage of Whealon* (1997) 53 Cal.App.4th 132, 142.)

"Among the factors that the court ordinarily should consider when deciding whether to modify a custody order in light of the custodial parent's proposal to change the residence of the child are the following: the children's interest in stability and continuity in the custodial arrangement; the distance of the move; the age of the children; the children's relationship with both parents; the relationship between the parents including, but not limited to, their ability to communicate and cooperate effectively and their willingness to put the interests of the children above their individual interests; the wishes of the children if they are mature enough for such an inquiry to be appropriate; the reasons for the proposed move; and the extent to which the parents currently are sharing custody." (*In re Marriage of LaMusga* (2004) 32 Cal.4th 1072, 1101 (*LaMusga*).)

In this case, the trial court considered all of the *LaMusga* factors and made detailed findings on each in both its May 18 Statement of Decision and September 15 Formal Findings.

On appeal, Father challenges only one of the trial court's findings, arguing the court erred by failing to properly determine the parties' "actual 'timeshare.'" To the contrary, the court noted there was "much discussion about the time share based upon the parenting arrangement the parties followed," but found "it is clear that [Mother] had primary custody and appears to have handled most of the educational, medical, and

7

dental-related aspects of [the minor]'s life." This finding was supported by substantial evidence.

The trial court further found Father's testimony regarding the timeshare was not credible, Father "was willing to exaggerate or mislead the Court in order to prevent [the minor] from moving away," and Father "was willing to answer questions in whichever direction would support [the minor] remaining in Orange County with him." We do not second-guess these findings. "'Credibility is a matter within the trial court's discretion,' and the reviewing court must defer to the trial court's findings on credibility issues." (*Niko v. Foreman* (2006) 144 Cal.App.4th 344, 365.)

We conclude the trial court properly considered and applied the *LaMusga* factors and that substantial evidence supported its findings. We therefore conclude the court did not err in determining under *Burgess* the custody order should be modified to give Mother sole physical custody to allow the minor to move with her to Florida.

III.

THE TRIAL COURT DID NOT ERR BY NOT PERMITTING LIVE TESTIMONY FROM THE MINOR REGARDING HIS CUSTODY AND VISITATION PREFERENCES

Father argues the trial court committed reversible error by not permitting the minor to personally testify in court regarding his custody and visitation preferences. He contends the court was required to—but did not—make an explicit finding that testifying in person would not be in the minor's best interests. Father also contends the court could not properly draw conclusions about the minor's maturity or about the credibility of the minor's statements to the CCI investigator without hearing directly from the minor in court. We disagree with each of these contentions.

A. *Relevant Legal Authorities*

We begin, of course, with the governing law. Family Code section 3042 and California Rules of Court, rule 5.250 require the trial court to consider the child's preferences as to custody and visitation if the child is mature enough (Fam. Code, § 3042,

8

subd. (a)), and to permit a 14 year old to address the court on issues of custody and visitation unless the court "determines that doing so is not in the child's best interest, in which case, the court shall state its reasons for that finding on the record" (Fam. Code, § 3042, subd. (c)).  The court has "'very extensive discretion'" to determine what custody arrangements are, and are not, in the best interest of the child.  (*In re Marriage of Kim* (1989) 208 Cal.App.3d 364, 370.)  Even when a child expresses their preferences regarding custody to the court, the court has discretion to reject those preferences.  (*In re Marriage of Winternitz* (2015) 235 Cal.App.4th 644, 655 [statement of decision showed court considered child's wishes; failure to make custody order based on those wishes was not an abuse of discretion]; *In re Marriage of Hopson* (1980) 110 Cal.App.3d 884, 906–907 [court must consider child's preferences and give them due weight, but is not bound to decide custody according to them; applying former Civ. Code § 4600]; *In re Marriage of Mehlmauer* (1976) 60 Cal.App.3d 104, 110 [court considered and gave weight to 14-year-old's statement regarding custody, but had "'to look beyond this statement of a teenager'" to determine his best interests; applying former Civ. Code § 4600].)

B. *The CCI Report, Testimony of CCI Investigator, Appointment of Minor's Counsel, and Presentation by Minor's Counsel at the Evidentiary Hearing*

The CCI investigator interviewed the minor before the Evidentiary Hearing commenced.  The resulting CCI report contained a detailed statement of the investigator's discussion with the minor regarding his desire to remain in California with Father rather than move to Florida with Mother.  As summarized in the CCI report, the minor expressed a desire to remain in California where his friends and his school are located.  The investigator found the minor to be well spoken and able to express his thoughts and feelings on this matter.  If he moved to Florida, the minor would miss his father, his grandparents, and his father's home.  The minor claimed he saw his father nearly every day when his mother was working.  He had a good relationship with both parents but had a strong preference to remain.  The CCI report recommended the trial

9

court deny Mother's request for permission to move the minor to Florida and further recommended Father be granted primary physical custody of the minor. The CCI report was admitted into evidence at the Evidentiary Hearing.

The CCI investigator also testified at the Evidentiary Hearing about her interview with the minor. She saw no "red flags" suggesting he was not being truthful with her. She gave "significant" weight to the minor's stated preferences regarding custody and believed the minor was mature enough to present his preferences to the trial court. The CCI investigator testified regarding the factors she considered in making her recommendation that the minor be permitted to remain in California with Father.

Father listed the minor on his witness list for the Evidentiary Hearing, stating: "Pursuant to Family Code [section] 3042, Respondent requests that [the minor] be interviewed by Family Court Services for preference, or in any other manner deemed just and proper by the Court." Father's counsel told the trial court on August 20, 2021, during the Evidentiary Hearing, that the minor wanted to speak with the court.

Father's counsel requested the minor be interviewed again because, by that point, the minor had spent some time in Florida with Mother and might have further thoughts regarding his custody preferences. Mother's counsel objected to another interview as unnecessary, as the CCI investigator had already interviewed the minor regarding his preferences in connection with the CCI report. After hearing from both counsel on the issue, the trial court expressed concern the custody dispute was "really putting [the minor] in the middle of these parents over this issue" and noted "I already have his interview from [the CCI investigator]." The court continued: "I could see how there might be an update, but I'm getting concerned about—I'm a little concerned about just hearing from [the minor]." Accordingly, the court settled on "kind of a middle ground" by "appoint[ing] minor[']s counsel from the indigent panel list just so that minor[']s counsel can just provide whatever update that [the minor] wants to provide to the Court . . . ."

10

The trial court reiterated its concern for the minor's well-being and the effect of the proceedings on him, stating: "And I do want to remind the parties, I'm really worried about [the minor] being too involved in the selection process, so please do not talk to [the minor] about the move-away request. I don't want him to feel that he has to pick one parent, that he has to pick his friends, his school or anything like that. It's not healthy for [the minor]. It's not healthy for your relationship with [the minor]. [¶] And if I do hear that he is being influenced before he talks to minor[']s counsel, I'll take this into account because that's going to demonstrate a parent cannot co-parent . . . ."

At the continued Evidentiary Hearing on December 1, 2021, minor's counsel appeared and spoke on the minor's behalf. Minor's counsel reported he had personally met with the minor twice and his office had been in contact with the minor additional times. Minor's counsel opined that, for a child who (at the time) was "13 going on 14," the minor's maturity level was "a little bit beyond his years" and he was "definitely mature enough . . . to provide his opinion and preference in this case." Having spoken with the minor and each of the parents, minor's counsel advised the trial court he supported the minor's preference to live with Father, go to school in Orange County, and spend all major school breaks (with the exception of two weeks in the summer) in Florida with Mother.[2]

Minor's counsel further reported the minor was currently in his last year of middle school and was excited about attending a specific high school in Orange County and trying out for its basketball and baseball teams, even though he had no prior experience playing either sport. Minor's counsel conveyed the minor's views that, when he attended school in Florida, he did not get along with the students, had a great deal of

---

[2] Minor's counsel reported that, although the minor loves his half-brothers (one of whom resides with Mother in Florida) and enjoys spending time with them, "he absolutely wants to continue to live here in Orange County, California."

anxiety, and was "not happy at all."[3]  In response to the trial court's question if he was concerned whether Father's night-time employment would provide "enough oversight of [the minor] given that he's a teenage boy," minor's counsel acknowledged he was concerned about that, but expressed his view the minor was able to articulate a clear plan for where he would be and what he would do when Father was working.  He opined that the minor's high grades and selection as a student "ambassador" at his middle school suggested he would do well despite the lack of evening supervision while Father was working.

The trial court then asked minor's counsel: "And are you convinced that his preference is based upon which parent he wants to reside with during the school year or whether it's:  I want to be by my friends in Orange County; I've always been in Orange County, and I have the freedom to be with my friends in Orange County when Mom isn't here?"  Counsel responded:  "Well, I think that he likes to be with his friends.  There's no question about that.  And I think that he likes to be in Orange County because that's where he's familiar and stable with.  That's clear.  [¶]  But when you talk to [the minor], it is all about how excited he is to go to [the specific high school].  And I think that that's kind of one of the biggest deciding factors because he really just loves both parents.  [¶]  I didn't get the feeling from him that he was doing it to avoid a parent or avoid supervision.  I really just didn't feel that.  [¶]  You know, this is a 13-year-old who, you know, when you ask him about . . .  missing his brother, you know, in Florida, he's—he has no problem saying, yeah, you know, I really love my brother, and, yeah, when I'm in Florida, I get to see my brother, but, no, I'm really excited about going to [the specific

_____

[3]  Minor's counsel told the court he believed "one of the reasons that caused [the minor] to be so unhappy [in Florida] was the unknown, and how the whole situation with him getting transferred or admitted into the Florida school, he was kind of on the outs, and I think it scared him.  He just didn't know what was happening.  It appears that he was just very frustrated and confused . . . ."

12

high school], and I've looked into my electives. These are the teams I want to try out for. [¶] It's not, I want to go play video games; it's not, I want to go hang out with my friends. It's, I really want to go to [the specific high school]; I really like [my current middle school]; I love my mom; I really want to spend time with her, but I want to go to school and live with my father, and I like living with my father."

The trial court later stated: "I brought you on, [minor's counsel], because I think [Father] had a request to have [the minor] testify to the Court. I wanted to keep [the minor] from doing that."

Father testified he agreed with minor's counsel's recommendation to the court, and agreed it was consistent with his own understanding of what the minor wanted.

## C. *The Trial Court's Findings*

After the conclusion of the Evidentiary Hearing, the trial court made the following findings. Under the heading "The wishes of the minor child/determination of the maturity of the child based upon the evidence presented," the court stated:

"i. [The minor] is 14 years old, and he does have a strong preference to remain in Orange County with his father . . . ;

"ii. The Court finds, however, that it is unclear whether [the minor], while he does very much love his father, primarily wants to stay in Orange County because he wants to be around his friends and his school, as there was much discussion about his school, his friends, and the flexible schedule which he has while living with his father;

"iii. The Court questions [the minor]'s maturity level, as described by the example below:

"a. [The minor]'s statements about his father, despite the evidence/testimony which shows the rocky relationship they had right before Covid began (third week of March, 2020), as evidenced by the completely inappropriate, comments to a child by a parent, comments which were extremely hurtful and potentially damaging. Somehow, though, almost magically, [the minor] told the C.C.I. investigator

13

that everything was fine. In addition, [the minor] did not raise the inappropriate statements made by his father until the investigator raised them;

"b. [The minor] also minimized his relationship with his mother, siblings, and stepfather which does not evidence a lot of maturity as these statements were very goal-oriented statements. In regard to his statements which minimized his relationship with his mother, the Court notes the example of the trip to Florida for [the minor]'s spring recess in 2021. The Court heard testimony that [the minor] related to the investigator that his Mother 'worked all of the time' he was there and that [the minor] was 'bored'. However, the Court was presented with photographs which showed [the minor] out with friends and family in a variety of activities, none of which supported [the minor]'s statements. As a result, the Court questions the maturity of [the minor]'s statements or whether they are just result-oriented comments by [the minor];

"c. [The minor] is 14 years old and, like most children his age, he would like to have less supervision and be near their friends, all of which is completely understandable to the Court. However, the Court cannot rely on his desires alone without looking at the remaining factors and the overall best interests of the child. To that end, the Court notes the following:

"i. Through a review of Exhibit '14' (statements of a debit card given to [the minor] by [Mother] so he can buy whatever food or necessities he needs) which was introduced into evidence at the hearing, there is evidence that shows [the minor] around town after school and eating in a variety of locations, and the[n] he is picked up later by the [Father] in the evening at friends' homes in his old neighborhood; and

"ii. [A] neighbor/witness who lives in the old neighborhood in which the [Mother] and [the minor] lived, testified that [the minor] was picked up on more than one occasion from her home when [the minor] was spending time in his old neighborhood while the [Father] was working; and

14

"iii. The [Father] works nights from Wednesday through Sunday, allowing for less restrictions for a 14-year old to spend time with his friends."

*D. Analysis*

As an initial matter, it certainly cannot be said the trial court failed to consider the minor's preferences as to custody and visitation. The court heard from the CCI investigator about her interview with the minor about his preferences; admitted into evidence the CCI report, which also addressed the minor's desires; and heard at some length from minor's counsel concerning the minor's preferences, the reasons for them, and the reasons why minor's counsel supported them. The court also heard from Father regarding his understanding of the minor's preferences. There was no shortage of information before the court regarding what the minor wanted to have happen and why.

The question is whether the trial court was *required* to hear all this directly from the minor himself. We conclude it was not.

As noted above, Family Code section 3042 does not require the trial court to take live testimony from a child 14 years of age or older if the court determines that having the child address the court is not in the child's best interest and the court "state[s] its reasons" for that determination "on the record." (*Id.*, subd. (c).)[4] That is precisely what the court did here. Although the court did not explicitly parrot the language of the statute, its statements on the record at the Evidentiary Hearing leave no doubt it believed it would not be in the minor's best interest to testify: the court expressed concern the minor was "too involved" in the custody battle between the parents; expressed concern the minor was "in the middle of these parents over this issue"; and stated it wanted to ensure the minor did not feel pressure to "pick one parent," "pick his friends, his school or anything like that." The court expressed concern that this would not be healthy for the

---

[4] Because the minor turned 14 years old during the pendency of the hearing, we assume the statutory provision regarding 14-year-old children applies.

15

minor or for his relationship with his parents. The court stated it had appointed minor's counsel precisely to avoid the minor having to testify.

In short, the record makes clear the trial court found that having the minor—who was, after all, still only "13 going on 14" and in middle school—testify in court would not be in his best interest. The record also makes the court's reasoning clear. That is sufficient to satisfy Family Code section 3042.

Father next argues it was error for the trial court to draw conclusions about the minor's maturity or about the credibility of some of the minor's statements to the CCI investigator without hearing testimony directly from the minor. Again, we find no error.

As discussed above, the trial court has very broad discretion to determine whether to take testimony from a minor child. The court also has broad latitude to make custody determinations that differ from a child's expressed wishes. Even when a child expresses its preferences regarding custody to the court, the court has discretion to reject those preferences. (See *In re Marriage of Winternitz, supra*, 235 Cal.App.4th at p. 655; *In re Marriage of Hopson, supra*, 110 Cal.App.3d at p. 907; *In re Marriage of Mehlmauer, supra*, 60 Cal.App.3d at p. 110.) The court's 20-page statement of decision recites a litany of reasons for the court's ultimate custody decision, including the court's findings that Mother's testimony was far more credible than Father's; Mother had handled most of the "educational, medical and dental-related aspects" of the minor's life; Father exaggerated the time he spent with the minor; Father created false calendars of the time he spent with the minor; Father provided work records that contradicted his testimony about how much time he spent with the minor; Father was "willing to exaggerate or mislead the Court in order to prevent [the minor] from moving away" and was "willing to answer questions in whichever direction would support [the minor] remaining in Orange County with him."

The trial court further found that, while "there is a good record of co-parenting by [Mother]," Father was not "co-parenting in the bests interests of [the minor],

16

as [Father] has engaged in parenting for the goal-oriented result of keeping [the minor] with him, and this parenting has resulted in negative effects to the relationship between the parents and potentially between [Mother] and [the minor]." The court recited seven specific examples of poor co-parenting by Father, including (as but one example) Father's failure, in the one-year period during which the minor lived with him, to follow up on obtaining therapy for the minor with a licensed marriage and family therapist, even though Father acknowledged the minor was in need of therapy.

In the face of all these articulated reasons supporting the trial court's determination to grant primary custody to Mother—which are independent of the court's comments about the minor's maturity or veracity—Father fails to explain or demonstrate how having the minor testify in person would have changed the court's conclusion that it was in the minor's best interest to live in Florida with Mother.

Moreover, several of the statements by the minor that caused the trial court to question his maturity or veracity were refuted by documentary evidence. For example, the court found the minor appeared to try to minimize the quality of his relationship with his mother by stating in his CCI interview that he did not remember his mother attending his school events, but remembered his father doing so. The court noted that photographs admitted into evidence documented Mother's attendance "at almost every event throughout [minor's] childhood." Likewise, the minor had indicated he was "bored" while in Florida with Mother because she was always working. Yet, photographs provided to the court showed the minor engaged in a variety of activities in Florida with family and friends. Further, the minor denied in his CCI interview that Father ever did anything mean, scary, or not nice; yet the CCI report and testimony before the court

17

showed a history of "derogatory and hurtful comments" by Father to the minor.[5] The court could reasonably conclude having the minor appear in court and be confronted with documentary proof of discrepancies in his statements would not be in the minor's best interest.

Ultimately, whether to permit a minor to testify under these circumstances is a matter on which reasonable minds could differ. We might well have reached a different conclusion than the trial court did. This was not a case where a child was going to be forced to take the stand to testify against one of his parents. This teenager had already made his preferences clear to the attorney the court appointed to represent him for that very purpose, and Father advised the court the minor wanted to address the court concerning them. Given the court's expressed concerns about the minor's credibility and maturity, hearing directly from the minor would have been an opportunity for the court to get a better grasp on those issues. It also would have been an opportunity to ensure the minor felt he had been heard, which in turn could help him accept the court's ruling, even if it were not to his liking. The question before us, however, is not whether we would have handled the decision differently; it is whether we can say it was an abuse of discretion for the trial court to handle it the way it did. We cannot.

## IV.

### THE TRIAL COURT DID NOT ERR BY REFUSING TO PERMIT LIVE TESTIMONY AT THE AUGUST 9 HEARING

In addition to arguing the trial court erred by not allowing the minor to testify, Father argues more generally the court erred by deciding Father's July 18 RFO without conducting another evidentiary hearing. Again, we find no error.

---

[5] On cross-examination, Father testified without objection about some of his harsh comments to the minor, acknowledging they were not his "finest moment." In the CCI report, Jones stated Father had admitted the incidents captured on recordings were not "'[his] best moment,'" but had denied verbally abusing the minor "on a regular basis."

18

*A. Relevant Legal Authorities*

Father's argument relies on Family Code section 217, which provides: "At a hearing on any order to show cause or notice of motion brought pursuant to this code, absent a stipulation of the parties or a finding of good cause pursuant to subdivision (b), the court shall receive any live, competent testimony *that is relevant and within the scope of the hearing* and the court may ask questions of the parties." (*Id.*, subd. (a), italics added; see Cal. Rules of Court, rule 5.113(a)-(c).) A party seeking live testimony from non-party witnesses must, "prior to the hearing, file and serve a witness list with a brief description of the anticipated testimony." (Fam. Code, § 217, subd. (c).)

*B. Analysis*

The trial court dismissed Father's July 18 RFO and issued a statement of decision in which it found, "[n]one of the facts set forth in the supporting declaration attached to [Father]'s Request for Order provided a change of circumstances," and it "did not believe that a 'change of circumstances' had been sufficiently pled by [Father]." At the hearing on Father's July 18 RFO, Father's counsel stated he had subpoenaed witnesses to appear and testify, but he did not cite Family Code section 217; nor did he object to the court's August 9 Minute Order (which dismissed Father's July 18 RFO) on the ground the court failed to conduct an evidentiary hearing. Father's counsel first raised Family Code section 217 at a later hearing on September 14, at which the parties were supposed to be arguing about which party's version of a statement of decision for the August 9, 2022 hearing would be signed by the court.

Contrary to Father's contention, Family Code section 217 does not require the trial court to conduct a full evidentiary hearing in all circumstances. We conclude the court did not err in denying Father's July 18 RFO without permitting testimony. First, the right to live testimony under Family Code section 217 may be forfeited (*In re Marriage of Hearn* (2023) 94 Cal.App.5th 380, 390–391), including by failing to comply with the requirements of the statute (*Chalmers v. Hirschkop* (2013) 213 Cal.App.4th 289,

19

313 [trial court did not err in failing to hold evidentiary hearing on motion to modify order denying visitation where moving party did not file Fam. Code § 217 motion, did not comply with Fam. Code § 217's requirements, and court made finding there was good cause to deny request for live testimony].). At a minimum, Father failed to file and serve a witness list in connection with the August 9 hearing. (Fam. Code, § 217, subd. (c).) The right to live testimony also may be forfeited by failing to argue the applicability of Family Code section 217 in court, as was the case here. (*In re Marriage of Cohen* (2023) 89 Cal.App.5th 574, 582 [right to live testimony forfeited where counsel did not reference Fam. Code § 217 or request party be allowed to testify].)

Further, the trial court is required to consider live testimony under Family Code section 217 "*only if* that testimony is 'relevant and within the scope of the hearing.'" (*Segal v. Fishbein* (2023) 89 Cal.App.5th 692, 708.) Here, the court made a sufficient finding of good cause for ruling on the matter without a hearing by determining Father's July 18 RFO was a request for reconsideration of the January 18 Minute Order and/or the May 18 Statement of Decision, which embodied the court's previous custody order. (See *In re Marriage of Binette* (2018) 24 Cal.App.5th 1119, 1132 [no error in refusing to receive live testimony where "[t]he court's confirmation that it had thoroughly read the record in the case, along with the absence of any demand for live testimony, sufficiently indicates that it considered the pertinent factors and found that material facts were not in controversy and live testimony was unnecessary"].) "'The name of a motion is not controlling, and, regardless of the name, a motion asking the trial court to decide the same matter previously ruled on is a motion for reconsideration under Code of Civil Procedure section 1008.'" (*J.W. v. Watchtower Bible & Tract Society of New York, Inc.* (2018) 29 Cal.App.5th 1142, 1171 [treating motion for relief from terminating sanctions as motion for reconsideration].) The court carefully compared its May 18 Statement of Decision with the arguments made in Father's July 18 RFO and found every issue raised in Father's July 18 RFO already had been fully addressed in the statement of decision.

20

The trial court found Father's July 18 RFO did not sufficiently plead a change of circumstances and a hearing therefore was not required. We find no error in that conclusion. Family Code section 217 does not supplant the requirement that a noncustodial parent's showing of detriment to the child must be made in the moving or responding papers and supporting declarations; nothing in the statute itself or in its legislative history shows it was intended to alter in any way the basic burden of proof in this type of proceeding. Where, as here, the noncustodial parent's papers fail to make a showing of detriment, live testimony would not be relevant and therefore would not be within the scope of the hearing.[6]

V.

THE CONSIDERATION OF RECORDED CONVERSATIONS BETWEEN FATHER AND THE MINOR DID NOT PREJUDICE FATHER

Before the Evidentiary Hearing, Father filed a motion in limine to exclude reference to or consideration of audio recordings made by the minor of conversations he had with Father.[7] According to Mother, who provided transcripts of the recordings to the trial court as an attachment to her declaration in opposition to Father's December 2020 ex parte RFO to restrain the minor's move to Florida, the minor recorded conversations with Father "to show just how badly [Father] treats him while [the minor] is with his dad."

---

[6] Father cites *Elkins v. Superior Court* (2007) 41 Cal.4th 1337 (*Elkins*), which held a local rule prohibiting live testimony in marital dissolution trials and requiring proof to be made by written declarations violated the hearsay rule. (*Id.* at pp. 1356–1357, 1359–1360.) But *Elkins* explicitly avoided the question of whether the local rule violated due process. (*Id.* at p. 1357.) Moreover, *Elkins* was decided prior to the enactment of Family Code section 217. (*In re Marriage of Swain* (2018) 21 Cal.App.5th 830, 838 ["The Legislature adopted [Fam. Code] section 217 in response to our Supreme Court's holding in *Elkins*"].)

[7] The parties refer to these recordings as videos, although there is no indication they contained anything other than voice recordings. The appellate record shows they were .mov files.

21

The CCI investigator testified she considered and gave weight to the recorded conversations as part of the CCI report. The minor's counsel also reviewed the recorded conversations. There was testimony about the recordings at the Evidentiary Hearing, but neither the recordings nor the transcripts were admitted into evidence.

Family Code section 2022 makes inadmissible "[e]vidence collected by eavesdropping in violation of Chapter 1.5 (commencing with Section 630) of Title 15 of Part 1 of the Penal Code." (*Id.*, subd. (a).) Penal Code section 632 provides that, "A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device," is guilty of a crime. (*Id.*, subd. (a).)

It is not clear this provision applies in this case. By its terms, Family Code section 2022 "applies to a proceeding for dissolution of marriage, for nullity of marriage, or for legal separation of the parties" under division 6 of the Family Code. (Fam. Code, § 2000.) Custody of children, however, is addressed in division 8 of the Family Code. Father cites no case holding Family Code section 2022 applies to child custody proceedings.

Assuming the trial court erred by considering the recordings or transcripts without admitting them into evidence or erred by considering the CCI report or the testimony of the CCI investigator and the statements by minor's counsel (both of whom reviewed and considered the recordings), Father failed to show any prejudice. Despite hearing and considering the recordings, both the CCI investigator and the minor's counsel recommended placing the minor in Father's custody and allowing the minor to remain in California. Thus, their consideration of the recordings did not work to Father's detriment. And though the recordings did not paint Father in a positive light, Father has not shown that, absent the recordings, the court would have reached a contrary

22

conclusion.  There were ample other reasons given by the court to support its conclusion that granting Father primary custody would not be in the minor's best interest.

## VI.

### FATHER WAS NOT PREJUDICED BY ALLEGEDLY "LOST OR MISSING" PORTIONS OF THE TRANSCRIPTS OF THE EVIDENTIARY HEARING

Father argues reversal is required because of "lost or missing portions of transcripts of [Father]'s attorney objections at a critical phase of the evidence." (Capitalization, boldface, and underscoring omitted.)  Father asserts "[t]here are clearly missing portions of the transcript due to the technology used during the trial." [8]  Father appears to argue the trial court did not hear all of his attorney's evidentiary objections, or failed to rule on them, or failed to rule on them audibly to enable its rulings to be reflected on the transcript.  Father points to a single instance in which the court apparently did not hear his counsel's objection, but Father acknowledges he does not know whether this occurred at other points during the hearing.  Father has shown no error.

The single instance to which Father points does not support his claims that his counsel was prevented from objecting, the trial court failed to rule on his objections, or the transcript was incomplete.  The court stated it heard Father's counsel, but that counsel's most recent "objection was kind of quiet" and the court thought "it was actually more a connection issue."  Father's counsel ended up withdrawing the objection in question.

At most, the exchange cited by Father shows:  (1) the court had muted its own microphone—not counsel's—to block background noise; (2) when Father's counsel complained she had made an objection that was not ruled on, Mother's counsel and the trial court indicated they had not heard it or had not heard it clearly; (3) when the court

---

[8]  The Evidentiary Hearing was conducted remotely via Zoom.

23

asked Father's counsel to repeat the objection, counsel *withdrew* it; and (4) Father's counsel did not ask the court to revisit previous objections or ask the reporter to verify that counsel's previous objections had been recorded.[9]

We presume the correctness of the certified reporter's transcript of the proceedings. (Code Civ. Proc., § 273, subd. (a) [transcript certified by official reporter is prima facie evidence of testimony and proceedings]; *People v. Ayala* (2000) 23 Cal.4th 225, 289 [Evid. Code, § 664's presumption that official duty has been performed applies to court reporters].) There is no showing the transcript was incomplete or "missing" any objections. And even if the trial court had not ruled on every objection asserted by Father's counsel, counsel ultimately bears responsibility for ensuring its objections are heard, recorded, and ruled upon. (See generally *Gallant v. City of Carson* (2005) 128 Cal.App.4th 705, 712 [counsel's obligation to request ruling on evidentiary objections from the court "is long and well established"].)

## VII.

### THE TRIAL COURT'S FINDINGS UNSUPPORTED BY THE EVIDENCE MUST BE STRICKEN FROM THE STATEMENT OF DECISION AND THE FORMAL FINDINGS AND ORDER

Father challenges three findings set forth in the trial court's May 18 Statement of Decision and reiterated in the court's September 15 Formal Findings, arguing they are unsupported by evidence.

First, the trial court included the following statement as an additional factor supporting its custody decision: "The section of 'Substance Abuse' in the C.C.I. report sets for[th] substance abuse concerns which form an additional reason for the Court's decision."

Mother expressed concern to the CCI investigator about Father's alleged addiction to prescription pain killers many years earlier. She also told the investigator

---

[9] We note an objection by Father's counsel was made and overruled by the court just two pages earlier in the transcript.

24

Father was in Alcoholics Anonymous when she met him. Father denied any history of prescription drug abuse. The CCI investigator did not uncover any information that would support concerns about substance abuse by Father.

We agree the trial court's reference to "substance abuse concerns" has no evidentiary support in the record. There was no testimony at the Evidentiary Hearing regarding any drug or alcohol abuse by Father, and the CCI report concluded the information gathered for the report would not support such concerns. Accordingly, the court's reference to potential substance abuse by Father must be stricken from both the May 18 Statement of Decision and the September 15 Formal Findings.

Our determination that this finding must be stricken does not, however, require reversal of the trial court's judgment. Father cannot show this finding prejudiced him, as the court's decision to permit Mother's move away with the minor was otherwise amply supported by substantial evidence.

Second, the trial court found Father was not "co-parenting in the best interests of [the minor], as [Father] has engaged in parenting for the goal-oriented result of keeping [the minor] with him, and this parenting has resulted in negative effects to the relationship between the parents and potentially between [Mother] and [the minor]." The court cited the following example: "When [Mother] tried to book summer airline tickets for [the minor] to travel to Florida for her summer period with him, [Father] replied that he had plans and then was nonresponsive to [Mother's] follow-up on the issue. The Court heard testimony from [Father], which was less than credible, about a fishing trip that turned out to be just fishing at the dock." We conclude the court's finding is supported by the evidence and represents an inference fairly drawn from the evidence.

Third, the trial court found: "Quite concerning to the Court was [Father]'s remarks that he was buying an electric bike for [the minor] for approximately $3,000. When the Court asked [Father] if he was buying the electric bike for [the minor] even if he moved to Florida, [Father] quickly replied 'no.' The Court is concerned that this

25

suggests that [the minor] knows he gets this bike if he remains in Orange County, almost incentivizing a stay here in California."

Notably, Father's testimony on this issue was inconsistent. In addition to testifying unequivocally the minor would *not* get the bike if he moved to Florida, Father testified there was no linkage between where the minor would live and whether he would receive the bike, and he also responded "no" when the trial court asked if Father and Mother had discussed getting the minor a new bike "wherever he may be." The court's conclusion that the minor's expressed preference to stay in California with Father may have been driven—or at least influenced—by the promise of an electric bike that would be honored only if Father prevailed in the custody dispute was supported by Father's own testimony.

VIII.

THE TRIAL COURT DID NOT ERR IN DENYING FATHER'S REQUEST FOR ATTORNEY FEES

Finally, Father contends the trial court erred by denying his request for an award of attorney fees he incurred in connection with the move-away custody dispute.

A.  *Relevant Legal Authorities*

Family Code section 2030 addresses awards of attorney fees when the parties appear for a postjudgment custody decision: "(1) In a proceeding for dissolution of marriage, nullity of marriage, or legal separation of the parties, and in any proceeding subsequent to entry of a related judgment, the court shall ensure that each party has access to legal representation, including access early in the proceedings, to preserve each party's rights by ordering, if necessary based on the income and needs assessments, one party, except a governmental entity, to pay to the other party, or to the other party's attorney, whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding.

"(2) When a request for attorney's fees and costs is made, the court shall make findings on whether an award of attorney's fees and costs under this section is

26

appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for legal representation of both parties.  If the findings demonstrate disparity in access and ability to pay, the court shall make an order awarding attorney's fees and costs.  A party who lacks the financial ability to hire an attorney may request, as an in pro per litigant, that the court order the other party, if that other party has the financial ability, to pay a reasonable amount to allow the unrepresented party to retain an attorney in a timely manner before proceedings in the matter go forward."  (Fam. Code, § 2030, subd. (a).)

The trial court may award attorney fees under Family Code section 2030 "where the making of the award, and the amount of the award, are just and reasonable under the relative circumstances of the respective parties."  (Fam. Code, § 2032, subd. (a).)  "In determining what is just and reasonable under the relative circumstances, the court shall take into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in [Family Code] Section 4320."  (*Id.*, subd. (b).)  "The parties' circumstances described in section 4320 '"include assets, debts and earning ability of both parties, ability to pay, duration of the marriage, and the age and health of the parties."'"  (*In re Marriage of Rosen* (2002) 105 Cal.App.4th 808, 829.)  "In assessing one party's relative need and the other party's ability to pay, the family court may consider all evidence concerning the parties' current incomes, assets, and abilities, including investments and income-producing properties."  (*In re Marriage of Sorge* (2012) 202 Cal.App.4th 626, 662.)

An order regarding attorney fees under Family Code section 2030 is reviewed for abuse of discretion, "and we therefore must affirm unless no judge reasonably could make the order."  (*In re Marriage of Rosen, supra*, 105 Cal.App.4th at p. 829.)

27

*B. Analysis*

Father does not contend the trial court failed to make the findings required by Family Code section 2030. He argues the court abused its discretion by failing to order Mother to pay his fees because of a disparity in their incomes.

In making its fee determination, the trial court had before it not only Father's income and expense declarations, but also Father's testimony regarding his income and payment of attorney fees. The court denied Father's request for attorney fees because it found: (1) Father's testimony regarding his income and available funds was neither credible nor consistent; (2) Father's testimony on the source of his payments of attorney fees was neither credible nor sufficient to enable the court to determine he needed to be reimbursed for attorney fees; (3) Father provided insufficient testimony regarding his needs; (4) Father's changing testimony increased the time required to litigate the case; and (5) although Mother had a considerably larger income than Father, the court was required only to order reasonably necessary attorney fees.

As the party seeking an award of need-based attorney fees, Father bore the burden to establish his need. (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 824.) Based on the trial court's articulated reasons for denying an award of fees—including the court's credibility findings regarding Father's testimony about his income and needs, which we do not second-guess (*Niko v. Foreman, supra*, 144 Cal.App.4th at p. 365 [reviewing court defers to trial court's findings on credibility])— we find no abuse of discretion. We certainly cannot say no judge could reasonably deny Father's request for fees on this record.

Nor are we persuaded by Father's argument that the lack of an interim attorney fees award prejudiced him because he was unable to afford to hire counsel to object to the transcripts of the recordings of Father's conversations with the minor before

28

they were provided to the CCI investigator.[10] As noted above, even after considering the recordings, the CCI investigator recommended Mother's request for a move-away order be denied and the minor remain with Father. Father cannot show any prejudice.

## DISPOSITION

The postjudgment orders are affirmed.

The matter is remanded and the trial court is directed to modify the May 18 Statement of Decision and the September 15 Formal Findings by deleting the following: "The section of 'Substance Abuse' in the C.C.I. report sets for[th] substance abuse concerns which form an additional reason for the Court's decision."

Because respondent did not appear on appeal, no party shall recover costs.


GOODING, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


GOETHALS, J.

---

[10] Father also argues an interim award of attorney fees would have resolved the purported problem of his counsel's objections being muted, not ruled on, or not reported during the first portion of the Evidentiary Hearing. In light of our conclusion that Father showed no error with respect to his objections, we find this argument unpersuasive.